UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KEITHON PATTERSON,

     Plaintiff,

v.                             Case No.:  2:22-cv-331-SPC-NPM

THE CITY OF CAPE CORAL,
FLORIDA,

     Defendant.

_____/

## OPINION AND ORDER

Before the Court are Defendant City of Cape Coral's Motion for Summary Judgment (Doc. 33), Plaintiff Keithon Patterson's response (Doc. 34), and Defendant's reply (Doc. 37).

## BACKGROUND[1]

This is a workplace discrimination suit.  Plaintiff alleges he suffered a hostile work environment, discrimination, and retaliation because he is African American.  Plaintiff started with Defendant in July 2019 in the Plan Review Section of the Building Department but voluntarily switched to another department in August 2022.  He's worked there ever since.

---

[1] Unless otherwise noted, the facts are agreed on by the parties or are undisputed in the record.

1

Plaintiff enjoyed early success with Defendant.  Within his first eight months, Defendant promoted him twice.  The second promotion was to chief plans examiner, the role Plaintiff held when this litigation came to fruition.

Within weeks of the promotion, Plaintiff saw a coworker at City Hall who commented about his race: "Now that you're the head n*gger in charge, what are you going to do?"  (Doc. 33-1 at 38:16-22).  Plaintiff asked what he meant, to which the coworker replied, "Now that you're the head n*gger in charge you don't have to do what Henry says[.]"  (Doc. 33-1 at 38:20-23; 39:9-13).  Plaintiff told the coworker his words were "entirely inappropriate" and that he was offended.  (Doc. 33-1 at 39:14-16; 40:13-41:9).

Fast forward more than a year.  On July 20, 2021, Plaintiff met with his supervisor, Stephen Poposki, about complaints Plaintiff's staff had about him.  (Docs. 33-1 at 59:16-23; 34-10 at 2).   Poposki explained to Plaintiff he investigated the complaints and shared his findings with their boss, Vincent Cautero.  (Doc. 34-20 at 3).  At this time, Cautero was the Development Services Director who oversaw the Building Division.  (Doc. 33- at 1-2).  Poposki allegedly told Plaintiff that Cautero's response was, "I am going to teach that boy [Plaintiff] a lesson." (Doc. 33 at 4; Doc. 34 at 6).  Cautero denies this comment.  (Doc. 33-2 at 3-4).

The next day, Plaintiff learned another employee accused him of sexual harassment.  (Doc. 34-10 at 3).  Plaintiff denied the accusation.  Defendant

investigated and counseled Plaintiff on professionalism.  (Doc. 33-2 at 2-3).  No other disciplinary action was taken.

About a week after the sexual harassment allegation, Plaintiff emailed Cautero to complain about discrimination.  (Docs. 34-1 at 5; 34-10 at 4).  A few weeks later, Cautero met with Plaintiff.  But Plaintiff says they only discussed his management style and his staff questioning his competency.  (Doc. 34-10 at 4-5).  Nothing was mentioned about his reported discrimination.

On August 16, 2021, just four days after the meeting, Plaintiff dual-filed a Charge of Discrimination with the Florida Commission on Human Relations and Equal Employment Opportunity Commission ("EEOC").  (Docs. 34-1 at 5; 34-10).  He alleged unlawful discrimination and retaliation because the sexual harassment investigation came "on the heels of racial activity in his department, racial slurs directed at [him], and a threat from [his] director 'to teach [him] a lesson.'"  (Doc. 34-10 at 1, 10).   The state agency dismissed the charge in February 2022, and the EEOC did the same the next month.  (Doc. 1-1).

On the same day as the EEOC dismissal, Plaintiff sent a formal grievance about Cautero to Defendant's former city manager.  (Doc. 34-12).  According to Plaintiff, he set work hours for his team that Cautero told them to ignore.  Plaintiff maintained that other supervisors had leeway to set their

teams' schedules, but he was not afforded the same opportunity.  Plaintiff alleged the lopsided treatment was discriminatory.  (Doc. 34-12 at 1).

Around this time, Defendant created a position titled, "Deputy Development Services Director."  (Doc. 34-5).  Some duties included "[a]ssist[ing] as assigned in managing Development Services functions related to city planning, land development, building, permitting, and code compliance," "[a]ssist[ing] Director in establishing and implementing policies, procedures, rules, techniques, and practices to improve operational efficiency" and "[e]stablish[ing] process of staff cross-training and provid[ing] opportunities for staff training in new skills and/or updating existing certifications."  (Doc. 34-5 at 1).  Cautero had the final decision-making authority over the hiring.  Plaintiff applied for the would-be promotion.  (Doc. 34-6).

While awaiting word on his application, Poposki issued Plaintiff a twenty-page, written reprimand about his work performance, supervision of others, and communication skills.  (Doc. 33-4).  Some alleged deficiencies included him "not conducting a reasonable amount of plan review or keeping up with due dates in [his] plan review queue," "not effectively managing, distributing, and monitoring plan review assignments for the plans examiner section," "cut[ting] off communication between the plans examiners and the Building Official," and "caus[ing] distrust among the staff."  (Doc. 33-4 at 2-

13).  Plaintiff responded to the reprimand in writing and signed the document under protest but maintains the discipline was later rescinded.  (Doc. 33-4 at 1, 14-20; Doc. 34-1 at 5).  About a week later, Plaintiff learned that Cautero rejected his application because he did not "meet the minimum qualifications as listed in the job description."  (Doc. 34-8).  Cautero ultimately hired himself for the position.  (Docs. 33-2 at 1; 34 at 18).

From there, Defendant and Plaintiff took swift actions.  On the same day Cautero rejected Plaintiff's application, Defendant hired an outside law firm to investigate the work environment in the Plan Review Department.  (Doc. 33-3).  Plaintiff sued a few weeks later and voluntarily switched to a different department a couple of months later.

The Amended Complaint is the operative pleading, and it alleges race-based hostile work environment, race discrimination, and retaliation under Title VII of the Civil Rights Act and the Florida Civil Rights Act ("FCRA").  (Doc. 22).  Defendant moves for summary judgment on all claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs summary judgment.  It says, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine dispute" exists when a rational factfinder could find for the non-moving party.  A fact is "material" if

5

it might affect the outcome of the case. Judgment is appropriate "as a matter of law" when the non-moving party has not made an adequate showing on an essential element of which he must prove. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding summary judgment, the court must view the evidence and make all reasonable inferences for the non-moving party. But courts may not make credibility determinations or weigh the evidence when reviewing the record. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (it is the jury's job, not the court's, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses").

## DISCUSSION

Plaintiff's hostile work environment, discrimination, and retaliation claims proceed under Title VII and the FCRA. Because the same standards govern both laws, the Court will analyze the claims together. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010); *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).

To start, the Court repeats several core principles of employment law that will help frame its analysis. First, Title VII prohibits race discrimination against individuals regarding their compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). This is called disparate

treatment. And disparate treatment can come in two forms—a hostile work environment or a tangible employment action (e.g., failure to promote).

Second, Title VII prohibits an employer from retaliating against an employee who opposes discrimination and harassment. 42 U.S.C. § 2000e-3(a). Ultimately, the employee must prove the employer's "desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Third, Title VII (for better or worse) is not an avenue for a court to "sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). It is not a court's role "to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266; *see also Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). It also follows "that not all subjectively offensive language in the workplace violates Title VII." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337 (11th Cir. 2023).

Against these principles, the Court turns to Plaintiff's claims.

**A. Hostile work environment (Counts I and II)**

An unlawful hostile work environment is one permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive [enough] to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up). Whether a hostile work environment exists is case-specific and not "a mathematically precise test." *Id.* at 22. The context of offending words or conduct is important and cannot be viewed in isolation. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used[.]").

To prove a hostile work environment, a plaintiff must show (among other things) the harassment was severe enough to change the terms and conditions of his employment and created a discriminatorily abusive working environment. *Yelling*, 82 F.4th at 1334. This showing has both subjective and objective parts: the plaintiff must have subjectively perceived the harassment to be severe, and a reasonable person in the plaintiff's position must also find the environment abusive. *See id.* at 1335 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)). The objective part is at issue.

8

To evaluate whether a work environment is objectively hostile, courts consider the totality of circumstances. *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1250 (11th Cir. 2014). This can include the frequency of the conduct, its severity, whether the conduct was physically threatening or humiliating (versus a mere offensive utterance), and whether the conduct unreasonably interferes with the plaintiff's job performance. *See Yelling*, 82 F.4th at 1335. No single factor is required. *See id.*

Plaintiff argues he endured an objectively hostile work environment because his coworker called him the N-word. And if the slur alone isn't enough, Plaintiff adds in Cautero's "teach that boy a lesson" comment.[2] To support his claim, Plaintiff relies heavily on *Smelter v. S. Home Care Services Inc.*, 904 F.3d 1276 (11th Cir. 2018).

In *Smelter*, a supervisor called the plaintiff a "dumb black n*gger" while she "jumped up . . . in rage" amid an argument. *Id.* at 1282-83. And that's not all. The plaintiff heard racist comments daily and gave examples of derogatory remarks directed at her and overheard. For example, a supervisor told her "that her straightened hair made her resemble a 'mixed monkey' from the

---

[2] Plaintiff also mentions once being asked if he got a promotion because of affirmative action and hearing other slurs against African Americans, Haitians, and Latinos to show a hostile work environment. (Doc. 34 at 10; Doc. 31-1 at 45:25-46:9; 52:8-53:24). But he offers no evidence on the who, what, and where of this allegedly offensive conduct. So the bare allegations do nothing to help show how an objectively reasonable person in Plaintiff's position would find a hostile work environment.

movie *Planet of the Apes*," and said that "black men are 'lazy' and 'the scum of the earth' and that 'black women[] ha[d] babies on welfare." *Id.* Because of the daily frequency and extreme severity of the harassment, the Eleventh Circuit found the plaintiff provided enough evidence for a reasonable jury to find the harassment was objectively severe or pervasive. *Id.* at 1287.

But *Smelter* does not fit here. Even if all Plaintiff's evidence is believed and all reasonable inferences are drawn in his favor, a reasonable jury could not find, based on the totality of the circumstances, a severe hostile work environment that changed the terms and conditions of Plaintiff's employment. Here's why.

The offending conduct was not frequent. The N-word incident was a one-time occurrence, as was Cautero's "teach that boy a lesson" comment. And more than one year lapsed between the two. *See, e.g., Godoy v. Habersham Cnty.*, 211 F. App'x 850, 853-54 (11th Cir. 2006) (affirming summary judgment where the Latin American plaintiff endured racial slurs nearly every shift and told him "to go back to his boat and sail to South America where he belongs").

Nor can the offending conduct be labeled severe considering all the circumstances. Using the N-word is ignorant and unacceptable. And its single use may create an unlawful hostile work environment. But this is not that case. At the time of the N-word incident, Plaintiff described his relationship with the coworker as "friendly." (Doc. 33-1 at 45:15-17). The coworker never

10

supervised Plaintiff or had any authority over him. (Doc. 33-1 at 77:6-16). In fact, Plaintiff ranked higher than the coworker, and the coworker fell under someone else's command. (Doc. 33-1 at 47:10-21). Their paths crossed on the heels of Plaintiff's promotion and only those two conversed. (Doc. 33-1 at 39:1-5). When speaking to Plaintiff, the coworker's tone "was pretty flat, neither jovial nor sad. He was probably in the middle." (Doc. 33-1 at 40:4-12).

Plaintiff did not stand idle to the slur. He called out the coworker for his offensive statement, and the coworker didn't prevent him from doing so. (Doc. 33-1 at 39:9-18; 40:15-41:9). Plaintiff told the coworker that "he was entirely inappropriate and that he should never say a thing like that to [him] again." (Doc. 33-1 at 39:8-16; 41:29). The coworker did not respond and there was no further exchange. (Doc. 33-1 at 39:17-18). The coworker later apologized, which Plaintiff accepted. (Doc. 33-1 at 48:4-18). Defendant suspended the coworker without pay for his conduct. (Doc. 33-5). The coworker never again used the N-word, nor made any other comments to Plaintiff about his race. (Doc. 33-1 at 39:17-22; 48:22-49:3). Plaintiff remained friendly with the coworker even after the incident. (Doc. 33-1 at 48:19-21; 49:4-11). No other City employee has ever used the N-word to Plaintiff. (Doc. 33-1 at 40:1-3).

And Cautero's "teach that boy a lesson" comment does not change the equation.[3]   According to Plaintiff, a reasonable jury could infer a racial implication to the comment.  But the undisputed record says otherwise.  The comment bore from a conversation between Cautero and Poposki about Plaintiff's job performance.  Poposki was reporting to Cautero his findings about complaints that Plaintiff's staff made about Plaintiff.  In response to Poposki's information, Cautero allegedly said he was going "to teach that boy a lesson."  This was the only remark Cautero—or any other supervisor—ever potentially made about Plaintiff's race.  And here's what Plaintiff said about the comment at his deposition:

> Q   Now, with regards to the statement "teach that boy a lesson," did Stephen Poposki ever tell you that Vince Cautero mentioned your race in any way in connection with that claimed statement?
>
> A   No.
>
> Q   Do you have any evidence that the statement "teach that boy a lesson" had anything to do with race?
>
> A   No.
>
> Q   Has Vince Cautero ever made any comments to you regarding your race?
>
> A   Not that I recall, no.

---

[3] Cautero denies saying the "teach that boy a lesson" comment, and Plaintiff never heard Cautero say it.  Plaintiff only heard it secondhand through Poposki.  Still, for summary judgment purposes, the Court will assume Cautero spoke those words.

(Doc. 33-1 at 60:13-61:4).  So the record does not show that Cautero held any racial animus against Plaintiff.  Even if the comment was racially charged, it was an offhand utterance made indirectly about Plaintiff.  Given this backdrop, Plaintiff fails to show that a reasonable person could find Cautero spoke with racial hostility rather than a benign intent.

Nor was the offending conduct physically threatening and humiliating. Plaintiff was far from singled out and harassed.  The N-word comment was made only between the coworker and Plaintiff, and Plaintiff was not even present for Cautero's comment.  It is not as if racial epithets or other derogatory language was directed at an employee during staff meetings or in the presence of others.  Even then, courts have found no hostile work environment. *See, e.g.*, *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57-58 (11th Cir. 2005) (finding no hostile work environment where there were repeated uses of the N-word, the rebel flag displayed on toolboxes and hard hats, the letters "KKK" on a bathroom wall, and a noose in another employee's locker over fourteen years); *Harrington v. Disney Reg'l Entm't,* Inc., 276 F. App'x 863, 876 (11th Cir. 2007) (affirming summary judgment for an employer where African American plaintiffs often overheard a manager and others called some plaintiffs "ghetto" and a managers told other plaintiffs they "looked like a bunch of monkeys").

13

Finally, Plaintiff has provided little evidence on how the conduct unreasonably interfered with his work performance or changed his work conditions. At most, he visited a therapist because of the overall discrimination he felt. But that didn't change how Plaintiff viewed his job effectiveness and skill. For example, Plaintiff rated his performance as "Above Operational Standard" on three annual self-evaluations, and Poposki did so twice. (Docs. 34-2, 34-3, & 34-4). He also pursued a promotion believing he was more than capable.

The Court neither excuses nor condones the unprofessional conduct that Plaintiff endured. But the Eleventh Circuit has set the bar to show unlawful harassment that this Court must follow. *Compare Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848-49 (11th Cir. 2017) (finding an issue of fact as to a hostile work environment where supervisors' used the N-word in a context intended to humiliate the African American plaintiff, supervisors admitted he was being mistreated because of his relationship with a white woman, a coworker known as the "grand wizard" called him "boy" and "you people," and others drove cars with confederate flag decals), *with McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (finding racial comments like calling black employees "girl" and "boys," calling a former black employee a "n*gger bitch," and saying the Sheriff "had never received the 'n*gger vote' and that he didn't want it" to be "too sporadic and isolated" to create a hostile work environment

14

because the comments were spread over two years). The instances Plaintiff has identified fall short of that bar.

At bottom, Plaintiff has not shown he endured a hostile work environment so permeated with discriminatory intimidation, ridicule, and insult that it changed his job conditions. The Court thus grants Defendant's motion and dismisses the hostile work environment claims.

## B. Race Discrimination (Counts III and IV)

Next, Plaintiff argues race discrimination when Defendant did not promote him to the deputy director position in April 2022.[4] Defendant denies that his failure to promote was race related. Before beginning, however, the Court must clarify the relevant framework to analyze this claim.

Defendant claims *McDonnell Douglas*[5] applies. Plaintiff argues that he was qualified for the deputy director position and Defendant's reason for not promoting him is pretext for race discrimination. But bookending his argument, he seems to add in another legal theory for discrimination: mixed motive. He argues, "A race discrimination claim requires only a showing that race 'was a motivating factor for the defendant's adverse employment action,'

---

[4] In Plaintiff's response to the summary judgment motion, he clarified his race discrimination claim is based on Defendant failing to promote him. (Doc. 34 at 15). Doing so mooted Defendant's other arguments about Plaintiff failing to show adverse employment actions and similarly situated individuals. (Doc. 33 at 12-17).

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

even if some other (lawful) consideration would have led to the same outcome." (Doc. 34 at 17 (citing *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016)). The addition is misplaced.

There are different legal theories to show unlawful discrimination: single-motive and mixed-motive. A plaintiff pursuing a single-motive theory must show that illegal bias was the *only* reason for the adverse employment action. *See* 42 U.S.C. § 2000e-2(a). Enter *McDonnell Douglas*, which lets a plaintiff prove discrimination through circumstantial evidence and a burden-shifting framework. But "*McDonnell Douglas* is inappropriate for evaluating mixed-motive claims." *Quigg*, 814 F.3d at 1237. That's because a mixed-motive claim alleges *both* nondiscriminatory and discriminatory reasons motivated an employer's action. *See* 42 U.S.C. § 2000e-2(m).

The problem for Plaintiff is he makes only a passing reference to a mixed-motive theory of discrimination. *See Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130-31 (11th Cir. 2019) (A "plaintiff cannot make only a passing reference to a mixed-motive theory to sufficiently raise the issue."). Nowhere does he say that Defendant had legitimate and illegitimate reasons for not interviewing him for the deputy director position. Instead, he only argues that Defendant's reasons were illegitimate and pretextual. This distinction matters because *McDonell Douglas*'s pretext requirement is "fatally inconsistent with the mixed-motive theory." *Quigg*, 814 F.3d at 1237. Because Plaintiff only

properly advances a single-motive theory, the Court need not delve into any mixed-motive content. *See McPherson v. Kelsey*, 125 F.3d 989, 995- 96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."). With that settled, the Court turns to *McDonnell Douglas*.

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff must first create an inference of discrimination through his prima facie case. To establish a prima facie case of disparate treatment involving a failure to promote, a plaintiff must show that (1) he is the member of a protected minority; (2) he was qualified for the promotion; (3) he was rejected; and (4) the promotion went to someone outside the protected class. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005).

Once a plaintiff makes his prima facie showing, "the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." *Id.* at 767. If the employer meets this burden, the plaintiff can show that the employer's reasons were pretextual. *Id.* at 768.

To show pretext, the plaintiff must meet each of the employer's proffered reason "head on and rebut it." *Alvarez*, 610 F.3d at 1266. The plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons—such "that a reasonable factfinder could find them unworthy of credence." *Id.* (quotation omitted). This requires

17

showing (1) that the reason given was false and (2) that unlawful discrimination is the true reason. *See id.* at 1267. Simply disagreeing with the reason given is not enough. *See id.*

The parties square off over whether Plaintiff was a good fit for the deputy director position. Plaintiff says yes. Defendant says no. According to Defendant, Plaintiff fell short on his assigned tasks, lacked follow-through on assignments, and defied orders. Cautero adds that plans examiners complained "that Plaintiff was intimidating, condescending, and disrespectful" and "described a low morale and negative work environment." (Doc. 33-2 at 2). At bottom, Plaintiff had management and communication issues as a chief plans examiner that did not bode well for a promotion.

Plaintiff sees things differently. He discusses how Cautero's assessment of his work and qualifications were unfounded. He outlines his qualifications including holding advanced degrees in public administration, being a licensed Florida contractor, having construction management and plumbing system design and engineering experience, earning above average or average annual review ratings, and receiving job-related awards and accolades.

But the fact that Plaintiff thinks more highly of his performance than Cautero is beside the point. *See Rojas v. Fla.*, 285 F.3d 1339, 1342 (11th Cir. 2002) (courts "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees"). The inquiry into pretext centers

on Cautero's beliefs—not Plaintiff's.  So what matters is whether Cautero was dissatisfied with Plaintiff for nondiscriminatory reasons, even if mistaken. The Court need not decide the wisdom or accuracy of Cautero's conclusion, or whether his decision was prudent or fair.  And with that, Plaintiff has provided no evidence, outside of his own conclusory say-so, that would undermine Cautero or cast doubt on why he says Plaintiff wasn't right for the promotion. *See Carlisle v. Rhodes & Rhodes Fam. Dentistry*, No. 22-13901, 2024 WL 621421, at *5 (11th Cir. Feb. 14, 2024) ("[E]ven if a plaintiff's evidence supports an inference that the proffered reason is "pretext of *something*," summary judgment is appropriate if the plaintiff does not produce evidence that the reason was pretext for unlawful discrimination."); *see also Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (the plaintiff always keeps "the ultimate burden of persuading the court that []he has been the victim of intentional discrimination.").  Plaintiff even admitted he has no evidence that his race was mentioned in connection with the decision not to interview him for the promotion.  (Doc. 33-1 at 69:16-70:14); *see also*

With nothing to suggest that Cautero's stated reasons for not promoting him were false and that unlawful race discrimination was the true reason, Plaintiff has failed to carry his burden under *McDonnell Douglas*.  The Court thus grants Defendant's motion and dismisses the race-discrimination claims.

## C. Retaliation (Counts V and VI)

Last is Plaintiff's retaliation claim, which is based on circumstantial evidence. So the Court again turns to *McDonnell Douglas*. A plaintiff must first prove a prima facie case of retaliation by showing that (1) he engaged in statutorily protected activity; (2) he suffered adverse employment action; and (3) the adverse employment action was causally related to the protected activity. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134-35 (11th Cir. 2020). If the plaintiff does so, the employer must articulate a legitimate, nonretaliatory reason for its action. *Id.* at 1135. If the employer succeeds, the plaintiff must show that the reasons were false and the employer's real reason was retaliation. *Id.* Ultimately, to succeed on a retaliation claim, the plaintiff must show his protected activity was the "but-for cause" of the challenged action. *See Nassar*, 570 U.S. at 362; *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) ("[A] plaintiff must prove that had [he] not complained, [he] would not have been fired."); *see also Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (explaining the but-for standard goes to pretext at the summary-judgment stage).

Defendant argues (among other things) that it had a legitimate, nonretaliatory reason for not promoting Plaintiff to the deputy director position: he was not right for the position. Plaintiff reargues his pretext arguments from his race discrimination claims. He also emphasis that Cautero

was the sole decisionmaker on the promotion and he had internally and externally complained about Cautero's "teach that boy a lesson" comment, and "days later Cautero issued him discipline, then promptly denied his application for promotion." (Doc. 34 at 19). The record doesn't reflect quite what Plaintiff says.

To start, Cautero uttered the "teach that boy a lesson" comment about nine months before Plaintiff was not selected to interview for the promotion. Plaintiff also internally complained about Cautero's comment and filed his charge of discrimination about eight months before the promotion decision. At best, Plaintiff complained to the former City manager about Cautero undermining a work schedule he set for his staff a month or so before Cautero decided not to interview him. But this timing alone doesn't show that but-for him complaining to the former City manager, he would have been promoted. Cautero still believed Plaintiff was not competent as chief plans examiners (e.g., unable to perform assigned tasks, lacked follow-through on assignments, and defied directions). And Plaintiff has not rebutted this reason head on. In other words, Plaintiff has not shown that a reasonable factfinder could conclude Cautero's true desire for not promoting him was retaliation. The Court thus grants Defendant's motion and dismisses the retaliation claims.

Accordingly, it is

**ORDERED:**

21

1. Defendant City of Cape Coral's Motion for Summary Judgment (Doc. 33) is **GRANTED**.  The Amended Complaint is dismissed.

2. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff, terminate any deadlines, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on March 28, 2024.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of record